# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### Case No. 22-cv-21585-BLOOM/Torres

RICHARD PATT,

      Plaintiff,

v.

VOLKSWAGEN GROUP OF AMERICA,
INC. d/b/a Audi of America, Inc.,
*a foreign corporation,* and AUDI AG,

      Defendants.

_____/

## ORDER ON MOTION FOR SUMMARY JUDGMENT

**THIS CAUSE** is before the Court upon Defendants Volkswagen Group of America, Inc., d/b/a/ Audi of America, Inc. ("VWGoA"), and Audi AG's (collectively, "Defendants") Motion for Summary Judgment, ECF No. [89] ("Motion"). Plaintiff Richard Patt filed a Response in Opposition, ECF No. [114], to which Defendants filed a Reply, ECF No. [121]. The Court has carefully reviewed the Motion, the supporting and opposing submissions,[1] the record in this case, the applicable law, and is otherwise fully advised. For the reasons set forth below, Defendants' Motion is granted.

## I. BACKGROUND

This is a personal injury action arising from injuries Plaintiff allegedly suffered on March 28, 2021, while driving an Audi SUV ("Vehicle") in Miami, Florida. Plaintiff originally filed this

---

[1] Defendants filed a Statement of Material Facts, ECF No. [92] ("SMF"), with their Motion for Summary Judgment. Plaintiff filed a Statement of Material Facts in Opposition to Defendant's Motion for Summary Judgment and a Statement of Additional Material Facts ("SAMF"), ECF No. [115], with its Response to Defendant's Motion. Defendants filed a Reply to Plaintiff's SAMF, ECF No. [123].

action in state court, but VWGoA removed to this Court based on the parties' diversity. ECF No. [1]. On February 27, 2023, Plaintiff filed an Amended Complaint, ECF No. [33].

### A.  Amended Complaint

Plaintiff's Amended Complaint alleges that he was waiting at a stoplight when his seatbelt tightened, pulled him back, crushed his chest, and caused him to suffer a collapsed lung. *Id.* ¶¶ 11-12. He claims that the cause of the seatbelt tightening was Audi's "pre sense® rear technology," which is designed to detect impending rear-end collisions and initiate preventive measures to protect occupants from injury. *Id.* ¶¶ 14-15. He asserts that the pre sense® rear technology is defective and was "falsely triggered" by bicyclists who passed near the Vehicle. *Id.* ¶ 16.

Plaintiff alleges one count of Strict Products Liability (Count I) against Defendants. Count I asserts theories of "design defect, manufacturing defect, and failure to warn." *Id.* ¶ 23. Plaintiff also asserts a Count of Negligence against VWGoA (Count II) and a Count of Negligence against Audi AG (Count III). Count II asserts theories of "design defect, manufacturing defect, and failure to warn." *Id.* ¶ 32. Count III alleges a theory of failure to warn. *Id.* ¶ 38.[2]

### B.  Material Facts

Based on the Parties' briefings and the evidence in the record, the following facts are not genuinely in dispute unless otherwise noted.

Audi developed, designed, manufactured, assembled and tested Plaintiff's Vehicle, a 2021 Audi Q8. SMF ¶ 1; SAMF ¶ 1. Plaintiff's Vehicle is equipped with Audi's pre sense® technology. SMF ¶ 1; SAMF ¶ 1. Audi's pre sense® technology, within the limits of the system, "can initiate

---

[2] Despite ostensibly limiting Count III to a "failure to warn" claim, Plaintiff also alleges negligent design and manufacture claims. *See, e.g.*, ECF No. [33] ¶¶ 39-40 (Audi AG "had a duty to use reasonable care in the design, development, testing, manufacture, assembly, marketing and distribution of its vehicles …. [Audi AG] breached its duty of care . . . [b]y distributing, selling, and putting into the chain of commerce the subject vehicle, which Defendant [Audi AG] knew or should have known was in an unreasonably dangerous and defective condition . . . [and] [b]y designing an SUV with a driver assistance technology that triggers under inappropriate circumstances.").

measures in certain driving situations to protect vehicle occupants . . . ." ECF No. [92-1]. Audi's pre sense® rear technology does so by using "data from radar sensors at the rear corners of the vehicle and calculat[ing] the probability of a rear-end collision . . . ." ECF No. [92-2]. One of the "preemptive safety measures" that "can be initiated if the risk of a collision with the vehicle behind you is detected[]" is the "reversible tensioning of safety belts." ECF No. [92-3]. The pre sense® rear technology activates a reversible pretensioner when a risk of collision is detected, which uses an electric motor to tighten the seatbelt to "couple the occupant closely to the seat so that the forces in the event of a rear-end collision do not lead to large acceleration distances for the body." ECF No. [92-4] ¶ 24.

Plaintiff leased his Vehicle from Rancho Mirage Audi dealership in Rancho Mirage, California on December 30, 2020. SMF ¶ 3; SAMF ¶ 3. In December 2019, Plaintiff came down with either pneumonia or COVID-19. SMF ¶ 4; SAMF ¶ 4. This caused Plaintiff to suffer from chronic coughing, which resulted in separating Plaintiff's ribs from his cartilage, resulting in rib fractures. SMF ¶ 4; SAMF ¶ 4. Plaintiff subsequently underwent surgery to insert three metal plates and screws over his ribs to connect them back together. SMF ¶ 4; SAMF ¶ 4. Plaintiff was diagnosed with a "moderate to large size left pneumothorax[,]" or collapsed lung, during this time. SMF ¶ 4; SAMF ¶ 4. Plaintiff's chest hardware shifted during either May or June of 2020, prompting Plaintiff to undergo revision surgery to re-secure the metal plates and screws. SMF ¶ 5; SAMF ¶ 5.

On March 28, 2021, Plaintiff was in his Vehicle and stopped at a traffic light on Biscayne Boulevard and 15th Street. SMF ¶ 6; SAMF ¶ 6. Plaintiff was driving along with a passenger, David O'Connell ("O'Connell"), who was sitting in the passenger's seat. SMF ¶ 6; SAMF ¶ 6. O'Connell testified that between two and ten "racing-type" bicycles approached the stopped Vehicle from the rear, split around and passed the Vehicle, and ran through the red light while

continuing down the street. ECF No. [92-7] at 30-33.[3] . The bicycles did not collide with Plaintiff's Vehicle. *See* SMF ¶ 6; SAMF ¶ 6. O'Connell described the bicycles as moving at a "fair clip[,]" and that their speed was "definitely going faster than [O'Connell] would expect . . . at a red light." *Id.* at 33. Plaintiff testified that his seatbelt tightened when the bicycles passed the Vehicle, which "threw [Plaintiff] back in [his] seat." ECF No. [92-5] at 98 (generally, the "Incident"). O'Connell's seatbelt also tightened, but he testified that he was not injured. ECF No. [92-7] at 68.

Plaintiff testified that O'Connell heard him "wheezing" after the Incident, prompting O'Connell to ask Plaintiff if he was feeling okay. ECF No. [92-5] at 133. Plaintiff noted it was quite hot that day and that he "didn't think, even if I was wheezing, that it was connected to anything[]" at that time. *Id.* at 134. Plaintiff subsequently went home, ordered delivery for dinner, and went to sleep. *Id.* Plaintiff testified that he "felt fine, other than a little drained from being outside in the heat[]" at this time. *Id.* Later that night, "chest pain woke [Plaintiff] up." *Id.* Plaintiff estimates this occurred sometime between 1 a.m. – 5 a.m. *Id.* At 6:44 a.m. on March 29, 2021, Plaintiff called fire rescue and was admitted to the hospital with a pneumothorax diagnosis shortly thereafter. ECF No. [92-8] at 3; ECF No. [92-9] at 1. Plaintiff had a chest tube inserted, and his pneumothorax was resolved within 24 hours. ECF No. [92-10]. Plaintiff testified that he was told he suffered a "major pneumothorax" in the emergency room. ECF No. [92-5] at 136.

Plaintiff testified that he had his chest hardware revised again in May 2021 because the plate and screws continued to shift. ECF No. [92-5] at 158. Plaintiff had his chest hardware completely removed in January 2024. SMF ¶ 8; SAMF ¶ 8.

The Vehicle's owner's manual contains the following warnings regarding the pre sense® rear technology:

---

[3] The Court uses the pagination generated by the electronic CM/ECF database, which appears in the headers of all court filings.

**Audi pre sense rear**
Applies to: vehicles with Audi pre sense rear

Within the limits of the system, Audi pre sense rear uses data from radar sensors at the rear corners of the vehicle and calculates the probability of a rear-end collision with the vehicle behind you.

Audi pre sense preemptive safety measures can be initiated if the risk of a collision with the vehicle behind you is detected.

## Audi pre sense

**Introduction**
Applies to: vehicles with Audi pre sense

Within the limits of the system, the Audi pre sense functions can initiate measures in certain driving situations to protect the vehicle occupants and other road users. Depending on the vehicle equipment, various Audi pre sense systems may be installed:

⚠ **WARNING**

– Observe the safety precautions and note the limits of the assist systems, sensors, and cameras ⇨ *page 121*.
– Audi pre sense rear does not react to pedestrians, animals, crossing objects, and objects not detected as vehicles.

**Audi pre sense preemptive safety measures**
Applies to: vehicles with Audi pre sense

Depending on the vehicle speed and the vehicle equipment, the following functions may be initiated in certain situations:

– Visual and audio warnings
– Reversible tensioning of safety belts
– Closing the windows and panoramic glass roof
– Adjusting the seats
– Other preemptive safety measures by individual systems

ⓘ **Tips**

– Audi pre sense rear functions switch off when trailer mode is detected. There is no guarantee the functions will switch off when using a retrofitted trailer hitch.
– Audi pre sense rear functions may also switch off if there is a malfunction in the side assist system.

SMF ¶ 10; ECF Nos. [92-1]-[92-3].

Plaintiff has not retained an expert who can provide expert warning testimony. SMF ¶ 9; SAMF ¶ 9. Plaintiff testified that he did not read the owners manual's warnings regarding the pre sense® rear technology prior to the Incident. SMF ¶ 11; SAMF ¶ 11; ECF No. [92-5] at 165-67, 170-71.

Plaintiff's disclosed liability expert, Christopher Wilson ("Wilson"), limits his opinions to design defect. SMF ¶ 12; SAMF ¶ 12. Wilson's expert report opines "[t]hat the 'seatbelt tightening' described by [Plaintiff and O'Connell] was very likely due to an erroneous deployment of the reversible seatbelt pretensioners in the vehicle." ECF No. [94-1] ¶ 32. Wilson concludes "[t]his event was more likely than not related to the passing bicycles." *Id.* Wilson's supplemental expert report further provides that "the specific failure scenario that more than likely caused the erroneous deployment was anticipated by and known to Audi, and that they had encountered this failure

5

scenario in testing, and released the car for production knowing that in certain conditions the scenario would result in erroneous deployment of seatbelt pretensioners." ECF No. [114-1] ¶ 4. Wilson articulates this "specific failure scenario" as a "dead zone", or blind spot, resulting from "the configuration of two corner radars looking to the sides and rear of the vehicle with their rear coverage areas converging some distance behind the vehicle, but leaving a cone directly behind the vehicle where there is no coverage." ECF No. [114-1] ¶ 10.

Plaintiff has not retained an expert to testify on the issues of a manufacturing defect or causation between the Incident and Plaintiff's injuries. SMF ¶¶ 19-20; SAMF ¶¶ 19-20. Relevant here, Plaintiff asserts "an expert on causation is not required." SAMF ¶ 20. One of Plaintiff's non-retained treating physicians, Dr. Lawrence Ciment ("Dr. Ciment"), initially opined in an April 9, 2021 medical record that he "believe[s] the episode with [the] car restraint caused the puncture that led to the pneumothorax." ECF No. [92-16]. However, Dr. Ciment testified in his deposition that this opinion is "[b]ased on the story" Plaintiff told him and is not a medical diagnosis based on an evaluation of Plaintiff's medical records. ECF No. [92-17] at 41; SMF ¶ 20; SAMF ¶ 20. When asked about the cause of Plaintiff's pneumothorax, Dr. Ciment testified as follows:

> **Q. Got it. Right. And then the question would be, what caused those screws to penetrate if they did, in fact, penetrate, correct?**
> A. Right. So we know they penetrated because the CAT scan shows it. I don't know how long they were penetrating or how they got penetrated. That, I don't know.
> **Q. Okay. Well, let me put it in these terms. You couldn't say with reasonable degree of medical certainty that the tightening of the seatbelt caused the two screws to penetrate into the lungs, correct?**
> A. I can't – I can say the screws caused a pneumothorax. What caused the penetration I can't say with medical certainty, no.

ECF No. [92-17] at 45-46.

Defendants' expert, Dr. Robert L. Shuman ("Dr. Shuman"), opined in his expert report that "[t]here is no factual evidence that the seatbelt tension in the Audi on 3/28/2021 caused the pneumothorax found on 3/29/2021," and "[i]t is highly unlikely that the tightening of the seatbelt

could cause a pneumothorax." ECF No. [92-11] at 6-7. Defendants' medical and engineering

expert, Dr. Elizabeth H. Raphael, similarly opined that "[i]t is unlikely that pre-tensioning of the

driver's seat belt during activation of the Audi pre sense® system caused disruption of [Plaintiff's]

surgical hardware and subsequent pneumothorax." ECF No. [92-18] at 11.

## II. LEGAL STANDARD

A court may grant a motion for summary judgment "if the movant shows that there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

Fed. R. Civ. P. 56(a). The parties may support their positions by citations to materials in the record,

including depositions, documents, affidavits, or declarations. *See* Fed. R. Civ. P. 56(c). "A factual

dispute is 'material' if it would affect the outcome of the suit under the governing law, and

'genuine' if a reasonable trier of fact could return judgment for the non-moving party." *Miccosukee*

*Tribe of Indians of Fla. v. United States*, 516 F.3d 1235, 1243 (11th Cir. 2008) (citing *Anderson*

*v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986)).

A court views the facts in the light most favorable to the non-moving party, draws "all

reasonable inferences in favor of the nonmovant and may not weigh evidence or make credibility

determinations[.]" *Lewis v. City of Union City, Ga.*, 934 F.3d 1169, 1179 (11th Cir. 2019); *see also*

*Crocker v. Beatty,* 886 F.3d 1132, 1134 (11th Cir. 2018) ("[W]e accept [the non-moving party's]

version of the facts as true and draw all reasonable inferences in the light most favorable to him as

the non-movant." (citation omitted)). "The mere existence of a scintilla of evidence in support of

the [non-moving party's] position will be insufficient; there must be evidence on which a jury

could reasonably find for the [non-moving party]." *Anderson*, 477 U.S. at 252. "If more than one

inference could be construed from the facts by a reasonable fact finder, and that inference

introduces a genuine issue of material fact, then the district court should not grant summary

judgment." *Bannum, Inc. v. City of Fort Lauderdale*, 901 F.2d 989, 996 (11th Cir. 1990) (citation omitted).

## III. DISCUSSION

Defendants argue they are entitled to summary judgment because the undisputed evidence shows the pre sense® rear technology has no defect, let alone any defect that caused Plaintiff's injuries. Defendants contend this demonstrates that all of Plaintiff's claims fail as a matter of law. Plaintiff responds that the undisputed evidence establishes that whether the pre sense® rear technology has a defect constitutes a genuine dispute of material fact, as does whether any such defect caused Plaintiff's injury.

The Parties dispute whether Audi's pre sense® rear technology is defective, and whether that defect proximately caused Plaintiff's injuries. It is undisputed that Defendants designed and manufactured the pre sense® rear technology contained in Plaintiff's Vehicle. The Court notes that Plaintiff has withdrawn his manufacturing defect claims in response to Defendants' argument that those claims lack evidentiary support. *See* ECF No. [144] at 8 ("Plaintiff does not intend to proceed with the manufacturing defect claim and hereby withdraws it."). The Court's review of the evidence confirms the absence of any evidence to support Plaintiff's manufacturing defect claims. Defendants are accordingly entitled to judgment on Plaintiff's manufacturing defect claims in Counts I, II, and III. The Court proceeds to analyze whether the evidence demonstrates the pre sense® rear technology is not defective or whether any such defect caused Plaintiff's injuries.

### A.  Strict Products Liability – Design Defect

"Under Florida law, a strict products liability action based upon design defect requires the plaintiff to prove that (1) a product (2) produced by a manufacturer (3) was defective or created an

unreasonably dangerous condition (4) that proximately caused (5) injury."[4] *Brosius v. Home Depot Inc.*, 2022 WL 1272087, at *4 (M.D. Fla. Feb. 8, 2022) (citing *McCorvey v. Baxter Healthcare Corp.*, 298 F.3d 1253, 1257 (11th Cir. 2002); *West v. Caterpillar Tractor Co.*, 336 So. 2d 80, 87 (Fla. 1976)). "To prevail in a products liability case under Florida law for either negligence or strict liability, Plaintiff must establish a defect in the subject product." *Zuccaro v. Tricam Indus.*, No. 9:21-cv-80867, 2022 WL 17750747, at *10 (S.D. Fla. Sep. 12, 2022). "A product may be defective by virtue of a design defect, a manufacturing defect, or an inadequate warning." *Brosius*, 2022 WL 1272087, at *4 (quoting *Jennings v. BIC Corp.*, 181 F.3d 1250, 1255 (11th Cir. 1999)). "The burden to show that a defective design exists is on the plaintiff." *Farias v. Mr. Heater, Inc.*, 757 F. Supp. 2d 1284, 1293 (S.D. Fla. 2010) (citation omitted). "Design defects must be proven by expert testimony." *Alvarez v. General Wire Spring Co.*, 2009 WL 248264, *4 (M.D. Fla. Feb. 1, 2009) (citing *Drury v. Cardiac Pacemakers, Inc.,* 2003 WL 23319650, *4 (M.D. Fla. June 3, 2003)).

### i.   Product Defect

Florida law generally requires a plaintiff to show a product was defectively designed under the "consumer-expectation test," the "risk-utility test," or both. *Aubin v. Union Carbide Corp.*, 177 So. 3d 489, 510-11 (Fla. 2015). Under the consumer-expectation test, a product is defective if "the product fails to perform as safely as an ordinary consumer would expect when used as intended or in a manner reasonably foreseeable by the manufacturer." *Tillman v. C.R. Bard, Inc.*, 96 F. Supp. 3d 1307, 1338-39 (M.D. Fla. 2015). Under the risk-utility test, a plaintiff must demonstrate that "the foreseeable risks of harm posed by the product could have been reduced or avoided by the

---

[4] Florida law applies, as VWGoA removed this case on the basis of diversity jurisdiction. ECF No. [1]. The Court therefore must "decide the case the way it appears the state's highest court would." *Bravo v. United States*, 577 F.3d 1324, 1325 (11th Cir. 2009).

adoption of a reasonable alternative design . . . and the omission of the design renders the product not reasonably safe." *Cates v. Zeltiq Aesthetics*, 73 F.4th 1342, 1351 (11th Cir. 2023).

### 1. Consumer-Expectation and Risk-Utility Tests

Defendants contend the risk-utility test exclusively applies to this case because its pre sense® rear technology is a complex product that ordinary consumers do not have pre-conceived expectations about. Defendants also argue that Plaintiff cannot show their pre sense® rear technology is defective under either the consumer-expectation or risk-utility tests. Plaintiff responds that the consumer-expectation test applies to the pre sense® rear technology. Even if it does not, Plaintiff argues the undisputed evidence demonstrates this technology is defective under either test.

As a threshold matter, Defendants lack support for their position that only the risk-utility test can be logically applied to their pre sense® rear technology. The Florida Supreme Court explicitly "reject[ed] the categorical adoption" of the risk-utility test "and its reasonable alternative design requirement[]" in *Aubin v. Union Carbide Corp.*, 177 So. 3d 489, 510 (Fla. 2015), holding that Florida law continues to "adhere to the consumer expectation test[.]" *Id.* The Florida Supreme Court noted that although it "conclude[s] that the Third Restatement's risk utility test and establishment of a reasonable alternative design mandate are not requirements for finding strict liability . . . nothing precludes the plaintiff in proving his case . . . [by] showing that alternative safer designs exist[.]" *Id.* at 511.

Defendants nonetheless argue that Florida law requires applying the risk-utility test to complex products such as the pre sense® rear technology. For support, Defendants primarily rely on *Cavanaugh v. Stryker Corp.*, 308 So. 3d 149 (Fla. 4th DCA 2020), which held "the consumer expectations test cannot be logically applied here, where the product in question is a complex medical device available to an ordinary consumer only as an incident to a medical procedure." *Id.*

at 155. The court observed that although *Aubin* rejected the categorical adoption of the risk-utility test, it did not express disagreement with cases "recognizing some products may be too complex for a logical application of the consumer expectations test." *Id.* (citations omitted). One such case was *Force v. Ford Motor Co.*, 879 So. 2d 103 (Fla. 5th DCA 2004), which observed seat belts were "on the cusp" of being "too complex for an ordinary consumer to have any expectations concerning their proper operation" before ultimately concluding that the consumer-expectation test applied to the defective seat belt at issue. *Id.* at 109-10. Defendants contend *Cavanaugh* and *Force* demonstrate their pre sense® rear technology is too complex for a logical application of the consumer-expectation test, as this technology is considerably more complicated than conventional seat belt restraint systems.

The Court disagrees and finds the risk-utility test does not apply exclusively. As Plaintiff accurately observes, Defendants fail to cite a single case where a seat belt or related technology was found to be too complex to be properly subject to the consumer-expectation test. To the contrary, *Force* itself found seat belts are properly subject to the consumer-expectation test. 879 So. 2d at 109-10. Moreover, *Cavanaugh* does not stand for the proposition that the risk-utility test exclusively applies whenever a given product is sufficiently complex. As noted, *Cavanaugh* concluded the consumer-expectation test could not be applied to a "complex medical device available to an ordinary consumer *only as an incident to a medical procedure.*" *Id.* at 155 (emphasis added). The court made clear "[t]he applicability of the consumer expectations test 'does not depend necessarily on a product's complexity in technology or use.'" *Id.* at 155 n.4 (quoting *Jackson v. Gen. Motors Corp.*, 60 S.W.3d 800, 806 (Tenn. 2001)). Whether the consumer-expectation test applies instead "depends on whether 'prolonged use, knowledge, or familiarity of the product's performance by consumers is sufficient to allow consumers to form reasonable expectations of the product's safety.'" *Id.*

The medical device at issue in *Cavanaugh* "was never marketed to ordinary consumers[,]" meaning consumers "would not be purchasing [the medical device] and would not have formed expectations regarding the product." *Id.* at 155. Those considerations led the court to conclude that the "rationale for the consumer expectations test . . . simply does not apply" to that medical device. *Id.* Here, Defendants pre sense® rear technology was marketed directly to consumers, and the Vehicle's owner's manual contained details regarding the technology's functionality and limitations. *See* Audi of America, *Audi pre sense® systems*, AUDI USA, https://www.audiusa.com/us/web/en/inside-audi/innovation/driver-assistance.html (last visited April 10, 2024); ECF Nos. [92-1]-[92-3]. *Cavanaugh* is accordingly distinguishable, and in any event, fails to support *exclusively* applying the risk-utility test simply because the pre sense® rear technology is more complex than a conventional seat belt restraint system. The Court concludes that Plaintiff may rely on the consumer-expectation test to demonstrate that the pre sense® rear technology is defective. However, consistent with *Aubin*, Plaintiff also may rely on the risk-utility test to prove his case by "showing that alternative safer designs exist[.]" *Aubin*, 177 So. 3d at 511. Defendants in turn are free to show that they "could not have made the product any safer through reasonable alternative designs." *Id.* at 511.

### 2.  Whether the "pre sense® rear technology" is Defective

To meet their burden, Defendants accordingly must show that the undisputed evidence establishes the pre sense® rear technology does not have a defect under both the consumer-expectation and risk-utility tests. Defendants contend they are entitled to judgment because Plaintiff entirely fails to identify a defect in the pre sense® rear technology. Defendants argue Plaintiff's expert, Christopher Wilson ("Wilson"), fails to identify a defect in his expert report, and

Wilson's anticipated testimony is inadmissible.[5] Plaintiff argues whether the pre sense® rear technology is defective constitutes a genuine dispute of material fact. For support, Plaintiff relies on Wilson's expert report discussing a detection "dead zone" that exists within the pre sense® rear technology, as well as the Vehicle's owner's manual and Defendants' online marketing materials.

Plaintiff primarily relies on the consumer-expectation test to argue that whether the pre sense® rear technology is defective constitutes a genuine dispute of material fact. As noted, a product is defective under the consumer-expectation test if "the product fails to perform as safely as an ordinary consumer would expect when used as intended or in a manner reasonably foreseeable by the manufacturer." *Tillman*, 96 F. Supp. 3d at 1338-39. Plaintiff articulates a "dead zone" theory, namely, the pre sense® rear technology's "failure to discriminate between non-threatening objects and genuine collision threats," evidencing the technology's "potential to misinterpret [collision] scenarios[.]" ECF No. [114] at 3. Wilson attributes this "dead zone" to a blind spot resulting from "the configuration of two corner radars looking to the sides and rear of the vehicle with their rear coverage areas converging some distance behind the vehicle, but leaving a cone directly behind the vehicle where there is no coverage." ECF No. [114-1] ¶ 10. Wilson further opines that the passing bicycles were likely within this "dead zone", and that the subsequent "'seatbelt tightening' described by [Plaintiff and his passenger] was very likely due to an erroneous deployment of the reversible seatbelt pretensioners in the vehicle." ECF No. [94-1] ¶ 32. Wilson also notes "[t]his event was more likely than not related to the passing bicycles." *Id.*

Defendants argue Plaintiff's "dead zone" theory fails to indicate the pre sense® rear technology has a defect, and even if it did, Plaintiff lacks evidence that Defendants created the reasonable expectation that this technology would *not* deploy in circumstances such as the

---

[5] The Court does not consider the admissibility of Mr. Wilson's expert opinions. Whether Mr. Wilson's opinions are admissible is irrelevant in light of the Court's conclusion that the absence of medical causation testimony is fatal to Plaintiff's claims.

Incident. In short, Defendants contend that the pre sense® rear technology is not defective simply because it tightened Plaintiff's seatbelt when it detected a collision risk, but no collision was in fact imminent. Defendants argue they "never created the expectation in reasonable consumers that this technology would not tighten the Q8's safety belts when objects resembling a vehicle quickly approach the Q8, posing a threat of collision." ECF No. [89] at 7. Because false positives are a necessary feature of the pre sense® rear technology, Defendants assert that Plaintiff's "dead zone" theory simply describes the technology working as intended.

The Court disagrees with Defendants that the undisputed evidence establishes the pre sense® rear technology is not defective. Defendants are correct that the record cannot support a finding that the pre sense® rear technology is defective simply because it activated when no collision was in fact imminent. To the contrary, the record makes clear Defendants marketed this technology as activating in two scenarios: (1) if a vehicle is about to collide with the rear of your vehicle, or (2) if "the *risk of a collision* with the vehicle behind you is detected." SMF ¶ 10; ECF No. [92-2] (emphasis added). However, this fails to show the technology cannot be considered defective for activating during the Incident. Plaintiff's "dead zone" theory effectively envisions a third, defective scenario wherein the technology activates preemptive safety measures not because a rear collision is imminent—or sufficiently likely to be imminent—but because the technology fails to adequately differentiate between threatening or non-threatening objects within the "dead zone." That theory posits the pre sense® rear technology's activation is erroneous because the technology was activated due to its failure to accurately gauge the threat of rear-end collision, not because it accurately detected and calculated the risk of collision. Such deployments within the "dead zone" are thus not defective because they constitute false positives based on reliable detection of threating objects, but because they fail to reliably detect the risk of collision in the first place.

Defendants are therefore incorrect that Plaintiff's "dead zone theory", if substantiated, cannot show the "pre sense® rear technology" is defective. Here, Plaintiff supports this theory with Wilson's expert opinion indicating the technology features a "dead zone" where erroneous deployments may occur, and that the Incident may have been caused by such an erroneous deployment. *See* ECF No. [94-1] ¶ 32; ECF No. [114-1] ¶¶ 4, 10. Moreover, Defendants' owner's manual and marketing materials can support a finding that Defendants created the consumer expectation that the technology will exclusively activate either when a rear-end collision is about to occur, or when the technology detects a sufficiently high risk of a rear-end collision. *See* ECF No. [92-2] ("Audi pre sense preemptive safety measures can be initiated if the risk of a collision with the vehicle behind you is detected."); *see also* Audi of America, *Audi pre sense® systems*, Audi USA, https://www.audiusa.com/us/web/en/inside-audi/innovation/driver-assistance.html (last visited April 10, 2024) ("Audi pre sense® rear 'uses radar sensors in the rear bumper to help detect an impending rear-end collision and can initiate preventive measures. Among other things, this system helps by pretensioning the front safety belts and automatically adjusting the occupants' seats to a more optimal position.'").

Plaintiff thus provides evidence that the pre sense® rear technology may erroneously deploy when objects are within the "dead zone," and that Defendants created the expectation within consumers that such erroneous deployments would not occur. Defendants are accordingly incorrect that the record is devoid of evidence suggesting that the pre sense® rear technology is defective. However, even assuming Plaintiff can establish that the technology's "dead zone" constitutes a defect, Plaintiff is unable to show this defect caused his injuries.[6]

---

[6] Because the Court concludes Plaintiff cannot establish causation, it does not address whether the evidence also supports finding the pre sense® rear technology is defective under the risk-utility test.

### ii.   Causation

"To prove causation under a strict products liability theory, a plaintiff must prove that the product defect proximately caused his injury." *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1295 (11th Cir. 2005). "Regarding . . . proof of causation, in complex cases where a jury is asked to assess complex medical or scientific issues outside the scope of a layperson's knowledge, an expert's testimony is required." *Small v. Amgen, Inc.*, 723 F. App'x 722, 726 (11th Cir. 2018) (citing *Guinn v. AstraZeneca Pharm. LP*, 602 F.3d 1245, 1256 (11th Cir. 2010)). "Without expert testimony, the plaintiff's claim fails as a matter of law." *Id.* "[A] mere possibility of causation is not enough." *Pierre v. Intuitive Surgical, Inc.*, 854 F. App'x 316, 317 (11th Cir. 2021) (internal quotation omitted). Accordingly, where the issue of causation is "one of pure speculation or conjecture, or the probabilities are at best evenly balanced, it becomes the duty of the court to direct a verdict for the defendant." *Guinn*, 602 F.3d at 1256.

Defendants argue expert medical causation testimony is necessary because Plaintiff's alleged injuries—suffering a collapsed lung caused by the pre sense® rear technology's tightening of his seat belt—constitute injuries outside the scope of a layperson's knowledge of cause and effect. Defendants point out that Plaintiff concedes he has no expert to provide causation testimony, which they contend supports judgment as a matter of law. Plaintiff responds that expert causation testimony is not required here because a juror "may fairly rely on their own common sense to reach the obvious conclusion that the exertion of too much force to one's chest may cause an injury." ECF No. [114] at 11.

It is undisputed that Plaintiff lacks an expert to provide expert medical causation testimony. SMF ¶ 20; SAMF ¶ 20. As discussed, one of Plaintiff's non-retained treating physicians, Dr. Ciment, initially opined that he "believe[s] the episode with a car restraint caused the puncture that led to the pneumothorax." ECF No. [92-16]. However, Dr. Ciment testified in his deposition that

this opinion was "[b]ased on the story" Plaintiff told him and is not a medical diagnosis based on an evaluation of Plaintiff's medical records. ECF No. [92-17] at 41; SMF ¶ 20; SAMF ¶ 20. Furthermore, Dr. Ciment testified that he was unable to opine that the Incident caused Plaintiff's subsequent pneumothorax:

> **Q.  Got it.  Right.  And then the question would be, what caused those screws to penetrate if they did, in fact, penetrate, correct?**
> A.  Right.  So we know they penetrated because the CAT scan shows it.  I don't know how long they were penetrating or how they got penetrated.  That, I don't know.
> **Q.  Okay.  Well, let me put it in these terms. You couldn't say with reasonable degree of medical certainty that the tightening of the seatbelt caused the two screws to penetrate into the lungs, correct?**
> A.  I can't – I can say the screws caused a pneumothorax. What caused the penetration I can't say with medical certainty, no.

ECF No. [92-17] at 45-46. The record evidence thus confirms Plaintiff lacks admissible expert medical causation testimony.

Defendants contend the absence of expert medical causation testimony is fatal to Plaintiff's claims because whether a seat belt exerted sufficient force to cause Plaintiff's injuries presents a causal issue outside of a layperson's knowledge. Plaintiff responds by accurately observing that "expert testimony is not required when a jury could reasonably infer from the product's failure 'under all the attendant circumstances' that its defective condition caused the plaintiff's injury." *Goree v. Winnebago Indus., Inc.*, 958 F.2d 1537, 1541 (11th Cir. 1992). Plaintiff argues expert causation testimony is unnecessary because jurors may reasonably infer that a tightening seat belt caused Plaintiff to suffer a collapsed lung.

The Court accordingly must determine whether Plaintiff's injuries presents a commonsense issue of cause and effect, or whether it implicates complex medical or scientific issues outside the scope of a layperson's knowledge. If it is the latter, Plaintiff's design defect claims fail as a matter of law.

Plaintiff argues his injuries "paint[] a clear picture" rendering expert causation testimony unnecessary, namely, that he "was in good health prior to the accident, the seatbelt system failed in a manner that subjected him to an unusual and forceful constraint, and his injuries became apparent closely following this event." ECF No. [114] at 13. Defendants reply that the amount of force required to cause a collapsed lung, or pneumothorax, is beyond the understanding of the average layperson. Defendants contend expert causation testimony is particularly necessary here, where Plaintiff suffered a collapsed lung 15 months prior, resulting in the surgical installation of chest hardware consisting of metal plates and screws. Defendants argue a juror would be unable to reasonably infer that the tightened seat belt caused Plaintiff's injuries in light of those additional causal variables.

The Court agrees with Defendants that expert medical causation testimony is necessary. Plaintiff's assertion that a juror may simply infer that "the exertion of too much force to one's chest may cause an injury[]" oversimplifies the nature of his injuries. ECF No. [114] at 11. Plaintiff contends the tightened seat belt exerted sufficient force to collapse his lung. The amount of force required to do so is plainly outside of the scope of an average juror's understanding. Moreover, assuming the seat belt did in fact exert sufficient force to collapse Plaintiff's lung, the required assumption does not conclude the analysis. As noted, Plaintiff suffered a collapsed lung 15 months prior to the Incident, which required the installation of chest hardware, hardware that presented complications before, during, and after the Incident.

Assuming the seat belt exerted sufficient force to collapse Plaintiff's lung does nothing to address those additional variables. Doing so is particularly crucial here, as Plaintiff's passenger, O'Connell, experienced similar seat belt tightening but reported no injuries, let alone a collapsed lung. In short, the record paints a far more complicated picture than a plaintiff in good health who

was clearly injured externally by the tightening of his seat belt.[7] The evidence instead suggests Plaintiff's injuries may have been caused by the force exerted by the seat belt, complications arising from his chest hardware, or a combination of the two. Alternatively, Plaintiff's injuries may be unrelated to the Incident, instead resulting from a coughing fit exacerbated by his prior collapsed lung and complications with his chest hardware. A juror would be unable to reasonably account for those factors without the aid of expert medical causation testimony.

Defendants contend the absence of expert medical causation testimony demonstrates Defendants are entitled to summary judgment on Plaintiff's design defect claims. For support, Defendants cite to *Pierre v. Intuitive Surgical, Inc.*, 854 F. App'x 316 (11th Cir. 2021); and *Chapman v. Procter & Gamble Distrib., LLC*, 766 F.3d 1296 (11th Cir. 2014). In both cases, the Eleventh Circuit affirmed the district court's grant of summary judgment due to the absence of admissible expert causation testimony because such testimony was required to link the product in question to the plaintiff's injuries. *Pierre*, 854 F. App'x at 321; *Chapman*, 766 F.3d at 1316. Defendants argue *Pierre* and *Chapman* demonstrate summary judgment is warranted because necessary expert causation testimony is similarly absent here. The Court agrees. As discussed above, the Court finds that expert causation testimony is required to establish whether the pre sense® rear technology's defect, if any, caused Plaintiff's injuries. Plaintiff has failed to retain "*Daubert*-qualified, general [or] specific-causation-expert testimony that would be admissible at trial to avoid summary judgment." *Chapman*, 766 F.3d at 1316. Consistent with *Pierre* and *Chapman*, this shortcoming is fatal to Plaintiff's design defect claims as a matter of law.

---

[7] As noted, Dr. Ciment testified that although he could say within a reasonable degree of medical certainty that the screws in Plaintiff's chest punctured his lung and "caused a pneumothorax[,]" he could not say the tightened seat belt "caused the penetration . . . with medical certainty." ECF No. [92-17] at 46. Dr. Ciment's inability to state whether the tightening of the seat belt caused Plaintiff to suffer a pneumothorax casts further doubt on a juror's ability to reasonably infer that the seatbelt caused this injuries.

The authorities on which Plaintiff relies fail to support his position that expert causation testimony is unnecessary. The cases Plaintiff cites simply observe expert testimony is not always required to show a product is defective or that a defendant breached its duty of reasonable care. Those cases do not discuss whether expert testimony is needed to show a defect causing a plaintiff's injuries. *Worsham v. A.H. Robins Co.*, 734 F.2d 676, 682-85 (11th Cir. 1984); *Blackhawk Yachting, LLC v. Tognum Am., Inc.*, No. 12-14208-CIV, 2015 WL 11176299, at *3 (S.D. Fla. June 30, 2015) ("Further, expert testimony is often, but not always, required to establish defective design of a product.") (citation omitted); *Taylor v. Johnson Controls Battery Grp., Inc.*, No. 1314051-CIV-MARTINEZLY, 2013 WL 12076539, at *5 (S.D. Fla. Dec. 13, 2013), *report and recommendation adopted,* No. 1314051-CIV-MARTINEZ, 2014 WL 12187354 (S.D. Fla. Sept. 30, 2014) ("[T]he focus of the Defendant's argument is that the Plaintiff fails to produce an expert witness to prove . . . that it fell short of its duty of care."). Moreover, Defendants do not argue expert testimony is *always* required, but rather such testimony is required here in light of the complexities discussed above.

Plaintiff's reliance on *Atkins v. Humes*, 110 So. 2d 663 (Fla. 1959) fares no better. Plaintiff relies on *Atkins* for the proposition that "jurors of ordinary intelligence . . . [are] in many cases, capable of reaching a conclusion, without the aid of expert testimony, in a malpractice case involving a charge of negligence in the application or administration of an approved medical treatment." 110 So. 2d at 666. Plaintiff argues that like the negligent administration of medical treatment, no expert testimony is needed to permit a juror to reach the commonsense conclusion that the seat belt caused Plaintiff's lung to collapse. The Court disagrees. Plaintiff fails to articulate how the negligent administration of medical treatment is analogous to determining whether Plaintiff's seatbelt caused him to suffer a collapsed lung. The examples discussed in *Atkins* suggest a juror can reasonably infer a doctor was negligent when administering a medical treatment in

20

situations such as "fail[ing] to sterilize surgical instruments before performing an operation[]" or "cut[ing] off part of a patient's tongue in removing adenoids[.]" *Id.* (citations omitted). *Atkins* provides no support for concluding no expert causation testimony is required where, as here, Plaintiff contends the pre sense® rear technology is defective and led to his injuries, not the negligence of any individual.

Plaintiff next argues *Pierre* is distinguishable, a conclusion he contends makes clear expert causation testimony is unnecessary here. In *Pierre*, the plaintiff argued the defendant was liable for defectively designing "an electrosurgical medical device"—a pair of medical scissors—that injured plaintiff during a hysterectomy. 854 Fed. App'x at 317. The plaintiff argued the jury could reasonably interpret a video depicting her hysterectomy without the benefit of expert testimony. *Id.* at 320. The Eleventh Circuit disagreed, concluding "the interpretation of the hysterectomy video presented complex medical and scientific issues outside the scope of a layperson's knowledge, so expert testimony was required." *Id.* at 320-21. The court accordingly affirmed the district court's grant of summary judgment due to the absence of necessary expert causation testimony. *Id.* at 321. Plaintiff argues *Pierre* is distinguishable because, unlike a collapsed lung, a hysterectomy is plainly outside of the scope of a juror's commonsense understanding. Plaintiff also argues that unlike *Pierre*, Defendants provide no evidence suggesting that a jury could *not* reasonably infer that the tightened seat belt caused Plaintiff's injuries.

The Court disagrees that *Pierre* is distinguishable. To the contrary, *Pierre* reinforces the conclusion that expert causation testimony is required here. Plaintiff's assertion that Defendants lack evidence regarding a jury's ability to reasonably infer causation is nonsensical. Defendants point to the complexities discussed above to support their position that expert medical causation

testimony is required.[8] The Court is also unconceived that the hysterectomy-related injury in *Pierre* shows Plaintiff's injuries are within the scope of an average jurors understanding. The plaintiff in *Pierre* argued her expert's "differential diagnosis" testimony ruling out alternate causes, coupled with her general causation evidence that the scissors could cause her injury, presented sufficient proof of causation. That causation evidence included a video recording of the plaintiff's hysterectomy. The Eleventh Circuit found the plaintiff's expert testimony failed to support her claim that the defective scissors "most likely cause[d] her injury." *Id.* at 320. Without such testimony, the Eleventh Circuit concluded the jury could not simply watch the hysterectomy video to determine whether the defective scissors caused her injury, as the video "presented complex medical and scientific issues outside the scope of a layperson's knowledge." *Id.* The court observed permitting the jury to interpret the video without expert testimony would result in impermissible "speculation or conjecture[.]" *Id.* at 321 (quoting *Guinn*, 602 F.3d at 1256).

As noted, Plaintiff concedes he has no expert causation testimony. Unlike *Pierre*, Plaintiff does not point to *any* general causation evidence regarding the propensity of seatbelts to collapse lungs, let alone anything resembling a video depicting the Incident. Plaintiff argues the absence of such evidence shows his injuries are simpler than the plaintiff's hysterectomy-related injury in *Pierre*. It is unclear how, as the hysterectomy video in *Pierre* provided some guidance to jurors, yet the Eleventh Circuit rejected the video as insufficient without corresponding expert causation testimony. Here, Plaintiff points to nothing to guide the jury's deliberation on proximate causation. As discussed above, Plaintiff's injuries present a multi-causal scenario involving variables outside

---

[8] Plaintiff also asserts Defendants' "engagement of experts to contest medical causation implicitly acknowledges the plausible link between the incident and the injuries, thereby shifting the burden to them to disprove causation." ECF No. [114] at 12. Plaintiff lacks support for this position. Defendants do not have to affirmatively disprove causation simply because they argue expert causation testimony is necessary. The burden to prove each element of Plaintiff's claims instead remains with Plaintiff. *Farias*, 757 F. Supp. 2d at 1293. Defendants retain their burden as movants to show the undisputed evidence establishes they are entitled to judgment as a matter of law, but nothing more.

a layperson's common knowledge. Like the injury in *Pierre*, a jury cannot not simply infer Plaintiff's injuries occurred. This is particularly the case here, where Plaintiff fails to present any evidence to inform the jury's understanding of his injuries.

Plaintiff reiterates that the causal nature of his injuries is commonsense and emphasizes the close temporal relationship between the seatbelt tightening and his injuries. As Defendants accurately observe, however, "[t]emporal proximity is generally not a reliable indicator of causal relationship." *Chapman*, 766 F.3d at 1309-10. Plaintiff would essentially have a jury assume the tightened seatbelt must have caused his injuries because he suffered a collapsed lung several hours later. But such an assumption "is a classic 'post hoc ergo propter hoc' fallacy which 'assumes causation from temporal sequence.'" *Kilpatrick v. Breg, Inc.*, 613 F.3d 1329, 1343 (11th Cir. 2010) (quoting *McClain v. Metabolife Intern, Inc.*, 401 F.3d 1233, 1243)). The Court concludes that the absence of expert medical causation testimony renders the causal nature of Plaintiff's injuries "one of pure speculation or conjecture[.]" *Guinn*, 602 F.3d at 1256 (quoting *Gooding v. Univ. Hosp. Bldg., Inc.,* 445 So.2d 1015, 1018 (Fla.1984) (internal quotation marks omitted)). As in *Pierre*, it therefore "becomes the duty of the court to direct a verdict for the defendant." 854 Fed. App'x at 319-20 (quoting *Guinn*, 602 F.3d at 1256).

The Court concludes that expert medical causation testimony is necessary in this case, and the absence of any such testimony is fatal to Plaintiff's design defect claims. Defendants are accordingly entitled to summary judgment with respect to Plaintiff's design defect claim in Count I.

### B.  Negligence – Design Defect

The absence of expert medical causation testimony is also fatal to Plaintiff's negligent design claim. "To prove any products liability claim sounding in negligence . . . a plaintiff must establish (1) that the defendant owed a duty of care toward the plaintiff, (2) that the defendant

breached that duty, (3) that the breach was the *proximate cause of the plaintiff's injury*, and (4) that the product was defective or unreasonably dangerous." *Cooper v. Old Williamsburg Candle Corp.*, 653 F. Supp. 2d 1220, 1226 (M.D. Fla. 2009) (citation omitted) (emphasis added). The Court accordingly "need not consider" whether Defendants negligently designed the pre sense® rear technology because Plaintiff has "not produced sufficient admissible evidence to create a genuine issue of material fact as to causation—a necessary element of Plaintiffs' negligent design claim." *Pierre v. Intuitive Surgical, Inc.*, 476 F. Supp. 3d 1260, 1277 (S.D. Fla. 2020), *aff'd*, 854 F. App'x 316 (11th Cir. 2021) (citing *Cooper*, 653 F. Supp. at 1226; *Kilpatrick v. Breg, Inc.*, No. 08-10052, 2009 WL 2058384, at *11 (S.D. Fla. June 25, 2009) ("[F]ailure to proffer sufficient evidence of causation, an element critical to all of [plaintiff's] claims, [is] necessarily fatal to his efforts to avoid summary judgment")).

The undisputed evidence accordingly establishes Defendants are entitled to summary judgment with respect to Plaintiff's negligent design claims in Counts II and III.

### C.  Failure to Warn

As discussed above, Counts I – III also assert failure to warn claims against Defendants under theories of strict liability and negligence. Defendants contend they are entitled to judgment on Plaintiff's failure to warn claims because Plaintiff does not have a warnings expert to testify that Defendants warnings were inadequate, and because the undisputed evidence establishes Plaintiff cannot show Defendants' inadequate warnings proximately caused his injuries. Plaintiff responds that it can show Defendants warnings are inadequate without relying on a warnings expert. Regarding proximate causation, Plaintiff argues whether Defendants inadequate warnings caused his injuries constitutes a genuine dispute of material fact.

"[T]o succeed on a failure to warn claim a plaintiff must show (1) that the product warning was inadequate; (2) that the inadequacy proximately caused her injury; and (3) that she in fact

suffered an injury from using the product." *Eghnayem v. Bos. Sci. Corp.*, 873 F.3d 1304, 1321

(11th Cir. 2017) (citing *Hoffmann-La Roche Inc. v. Mason*, 27 So. 3d 75, 77 (Fla. 1st DCA 2009)).

"Under Florida law, however, '[w]here the person to whom the manufacturer owed a duty to warn

. . . has not read the label, an inadequate warning cannot be the proximate cause of the plaintiff's

injuries.'" *Leoncio v. Louisville Ladder, Inc.*, 601 F. App'x 932, 933 (11th Cir. 2015) (quoting

*Lopez v. So. Coatings, Inc.,* 580 So.2d 864, 865 (Fla. 3d DCA 1991) (record quotation omitted)

(footnote call number omitted)).

The Court need not consider whether expert warnings testimony is required to show

Defendants warnings are inadequate. Even assuming such expert testimony is unnecessary, the

undisputed evidence establishes Plaintiff cannot show Defendants' failure to provide adequate

warnings proximately caused his injuries. First, it is undisputed that the Vehicle's owner's manual

contains warnings regarding the "pre sense® rear technology". SMF ¶ 10; SAMF ¶ 10. Those

warnings provide in pertinent part:

> Within the limits of the system, the Audi pre sense functions can initiate measures
> in certain driving situations to protect the vehicle occupants and other road users
> . . . Audi pre sense rear uses data from radar sensors at the rear corners of the vehicle
> and calculates the probability of a rear-end collision with the vehicle behind you.
> Audi pre sense preemptive safety measures can be initiated if the risk of a collision
> with the vehicle behind you is detected.

ECF Nos. [92-1], [92-2]. The manual continues by identifying the preemptive safety measures that

may be initiated, including "visual and audio warnings" and "reversible tensioning of safety belts."

ECF No. [92-3]. Plaintiff disputes the *adequacy* of those warnings—namely, by pointing out the

owner's manual "does not contain warnings about the system's adverse effects or any warnings

pertaining to the specific incident in question[,]" SAMF ¶ 10—but not the fact that the manual

generally contains warnings regarding the pre sense® rear technology.

Second, it is also undisputed that Plaintiff did not read the warnings regarding the pre

sense® rear technology contained in the owner's manual prior to the Incident. SMF ¶ 11; SAMF

¶ 11. Plaintiff testified in his deposition that he did not review the warnings regarding the pre sense® rear technology. ECF No. [92-5] at 165-67, 170-71.

Defendants accordingly argue that they are entitled to judgment on Plaintiff's failure to warn claims, as the undisputed evidence establishes Plaintiff did not read the owner's manual's warnings regarding the pre sense® rear technology. Defendants contend their warnings could not have proximately caused Plaintiff's injuries as a matter of law regardless of whether those warnings were inadequate. Plaintiff responds that "whether there is a nexus between Dr. Patt allegedly not reading the car owner's manual and his injuries is an issue for the jury to decide[.]" ECF No. [114] at 8. But this argument ignores the Eleventh Circuit's guidance that under Florida law, a plaintiff's "failure to read the warning cuts off [a defendant's] liability based on the alleged inadequacy of the warning." *Leoncio*, 601 F. App'x at 933. As in *Leoncio*, Plaintiff's "deposition testimony unambiguously established that he had never read the warning[s]" contained in the manual. *Id.* at 933; ECF No. [92-5] at 165-67, 170-71. This is fatal to Plaintiff's failure to warn claims as a matter of law. *Leoncio*, 601 F. App'x at 933; *see Pinchinat v. Graco Children's Prod., Inc.*, 390 F. Supp. 2d 1141, 1147-48 (M.D. Fla. 2005) ("Plaintiff admits that she could have read the warnings, but failed to do so. Therefore, no proximate cause can be established between the allegedly inadequate warning and the death of [the plaintiff]. Summary judgment will be granted in favor of defendant as to the failure to warn portion of the strict products liability claim.").

Plaintiff relies on the fact that the owner's manual does not contain warnings regarding "the potential adverse effects" of the pre sense® rear technology nor "the high likelihood of "pre sense® rear misfiring[]" to argue whether Defendants failed to warn Plaintiff about the technology constitutes a genuine dispute of material fact. ECF No. [114] at 8-9. However, as discussed, those omissions are relevant to whether Defendants warnings are adequate, not whether Defendants provided warnings about the pre sense® rear technology in the first place. The adequacy of

Defendants warnings thus fails to create a genuine dispute of material fact. Even assuming Defendants warnings are inadequate, the undisputed evidence demonstrates those warnings could not have proximately caused Plaintiff's injuries. Defendants are accordingly entitled to summary judgment on Plaintiff's failure to warn claims in Counts I – III.

## IV. CONCLUSION

Accordingly, it is **ORDERED AND ADJUDGED** as follows:

1. Defendants' Motion for Summary Judgment, **ECF No. [89]**, is **GRANTED**.

2. The Court will issue its final judgment in a separate order.

**DONE AND ORDERED** in Chambers at Miami, Florida, on April 17, 2024.

**BETH BLOOM**
**UNITED STATES DISTRICT JUDGE**

Copies to:

Counsel of Record